## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JAKOB STEVENS AND KYLI KNICKERBOCKER STEVENS D/B/A FIRE CREEK FARMS, on their own behalf and on behalf of all others similarly situated, | Case No. 1:26-cv-02585 |
| *Plaintiff*, | **Jury Trial Demanded** |
| v. | **CLASS ACTION COMPLAINT** |
| NUTRIEN AG SOLUTIONS; CF INDUSTRIES HOLDINGS, INC.; KOCH AGRONOMIC SERVICES, LLC; YARA INTERNATIONAL ASA; THE MOSAIC CO.; AND CANPOTEX LTD., | |
| *Defendants.* | |

Plaintiff Jakob Stevens and Kyli Knickerbocker Stevens d/b/a Fire Creek Farms ("Fire Creek" or "Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as defined below), files this Complaint against Defendants Nutrien Ag Solutions; CF Industries Holdings, Inc.; Koch Agronomic Services, LLC; Yara International ASA; The Mosaic Co.; and Canpotex Ltd. (collectively, "Defendants"). Plaintiff, upon personal knowledge as to the facts pertaining to itself, and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action for damages, injunctive relief, and other relief pursuant to Section 1 of the Sherman Act and demands a trial by jury on all matters so triable.

### I.      NATURE OF THE ACTION

1.      This lawsuit seeks both monetary and injunctive relief arising from Defendants' unlawful and ongoing agreement to fix the prices for nitrogen, phosphate and potassium (potash) fertilizers (individual and collectively, "NPK Fertilizers") sold and purchased throughout the United States and its territories, from January 1, 2021 to the present day.

1

2.     Defendants are direct competitors and among the largest producers and sellers of NPK Fertilizers in the United States.

3.     Among the victims of the conspiracy are direct purchasers of NPK Fertilizers from the Defendants, including agricultural retailers, fertilizer mixers, members of farming associations, farm and planting partnerships/companies, and individual farmers/growers.

4.     To implement their price-fixing conspiracy, beginning at least as early as January 1, 2021, the exact date being unknown to Plaintiff at this time, Defendants conspired to artificially inflate the price of NPK Fertilizers.

5.     Defendants' unlawful agreement caused direct purchasers of NPK Fertilizers in the United States and its territories, including Plaintiff and the Class, to pay supra-competitive prices for NPK Fertilizers sold by Defendants in the United States and its territories from the period beginning no later than January 1, 2021 and running through the date on which the Class is certified (the "Class Period"), in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

## II.     JURISDICTION AND VENUE

6.     Plaintiff brings this class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the antitrust laws of the United States for Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

8.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (28 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at

all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District.

9.     Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the Illinois long-arm statute 735 ILCS 5/2-209 because each Defendant has transacted business in this state and because the Illinois long-arm statute extends jurisdiction to the limits of Due Process, and each Defendant has sufficient minimum contacts with the state of Illinois to satisfy Due Process.

10.     This Court has personal jurisdiction over each Defendant because each Defendant throughout the U.S. and including in this District and the state of Illinois—has transacted business, maintained substantial contacts, or committed overt acts in furtherance of its illegal scheme and conspiracy. The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the U.S., including in this District and the state of Illinois.

### III.     PARTIES

**A.     Plaintiff**

11.     Plaintiff Jakob Stevens and Kyli Knickerbocker Stevens d/b/a Fire Creek Farms is a family farm with its principal place of business at 3450 Plank Rd., Livonia, NY 14487.

12.     During the Class Period, Plaintiff purchased NPK Fertilizers in the United States or its territories at supra-competitive prices directly from one or more of the Defendants.

**B.     Defendants**

13.     Nutrien Ag Solutions is the global retail division, and wholly owned subsidiary of,Nutrien Ltd., with headquarters located at 3005 Rocky Mountain Avenue, Loveland, Colorado

80538. Nutrien Ag Solutions is one of the largest manufacturers and distributors of nitrogen, phosphate and potash NPK Fertilizers in the United Sates.

14.     Yara International ASA is a publicly traded company, listed on the Oslo Stock Exchange (YAR.OL), with headquarters located at Drammensveien 131, 0277 Oslo, Norway. Yara International ASA is a leading worldwide manufacturer of multiple varieties of nitrogen-based NPK Fertilizers.

15.     Koch Agronomic Services (KAS), LLC is a wholly owned subsidiary of Koch Ag & Energy Solutions, LLC, which is itself a wholly owned subsidiary of Koch Industries. KAS' headquarters is located at 4111 E 37th Street N, Wichita, Kansas, 67220. Koch is a leading manufacturer of nitrogen-based NPK Fertilizers throughout the United States.

16.     CF Industries Holdings, Inc. is a publicly traded company, listed on the New York Stock Exchange (NYSE: CF), with headquarters located at 2375 Waterview Drive, Northbrook, Illinois 60062. CF Industries Holdings, Inc. produces four nitrogen-based NPK Fertilizers for sale throughout the United States and the United Kingdom.

17.     The Mosaic Company is a publicly traded company, listed on the New York Stock Exchange (NYSE: MOS), with headquarters located at 13830 Circa Crossing Drive, Lithia, Florida 33547. The Mosaic Company is the world's leading integrated producer of concentrated phosphate and potash nutrients for use in NPK Fertilizers.

18.     Canpotex Limited is a private jointly owned export company, equally owned by Nutrien, Ltd. (of which Defendant Nutrien Ag Solutions is a subsidiary) and Mosaic Canada Corp Nutrition, LP (a wholly owned subsidiary of Defendant The Mosaic Company). Canpotex Limited is headquartered at Suite 700, 409 – Third Avenue South, Saskatoon, Saskatchewan, Canada S7K

4

5R5. Canpotex is the world's leading producer of potash minerals used in NPK Fertilizers, and controls over 90% of the potash market.

## IV.   FACTUAL ALLEGATIONS

### A.   NPK Fertilizers Generally

19.   Modern agriculture depends heavily on three essential nutrients that plants must have in large quantities: nitrogen, phosphorus, and potassium. These nutrients are supplied to crops through what farmers commonly call nitrogen, phosphate, and potash fertilizers—individually and in combination referred to as NPK Fertilizers (named after the chemical symbols for the nutrients they contain). Together they form the basis of most fertilizer programs around the world. Each plays a different role in plant growth, and each requires different raw inputs and is produced through distinct chemical and industrial processes.

20.   NPK Fertilizers may be applied individually or in blended formulations depending on crop and soil requirements. Farmers sometimes use single-nutrient products when a specific nutrient is needed, but the nutrients can also be combined into blended fertilizers containing nitrogen, phosphorus, and potassium in set proportions. These blends are typically labeled with three numbers indicating the percentage of each nutrient in the product.

*Nitrogen Fertilizers:*

21.   Nitrogen fertilizers are widely used in agriculture because nitrogen is the nutrient plants require in the greatest quantity. Nitrogen is a key component of chlorophyll, the molecule that enables photosynthesis, and it is also necessary for the formation of proteins and other biological compounds involved in plant growth. Adequate nitrogen supports the development of leaves and stems and is associated with faster vegetative growth and higher crop yields.

22.     Most nitrogen fertilizers originate from industrial ammonia production using the Haber–Bosch process. In this process, nitrogen gas from the air is combined with hydrogen, typically derived from natural gas, under conditions of high temperature and pressure in the presence of a catalyst to produce ammonia. This ammonia serves as the principal intermediate used to manufacture a variety of nitrogen fertilizer products.

23.     Common nitrogen fertilizers include Urea, Ammonium nitrate, Ammonium sulfate, and Urea ammonium nitrate solution. These fertilizers vary in nitrogen concentration and form but each supplies nitrogen that plants absorb as nitrate or ammonium ions. They are commonly sold as small, typically round granules or "prills."

***Phosphate Fertilizers:***

24.     Phosphate fertilizers supply phosphorus, an essential nutrient required for several core plant functions. Phosphorus plays an important role in energy transfer within plant cells, including through molecules such as ATP, and contributes to early plant development, root formation, and the production of flowers and seeds. Adequate phosphorus availability is therefore associated with strong root systems and successful crop establishment.

25.     Phosphate fertilizers are produced from phosphate rock, a naturally occurring mineral resource mined from geological deposits. After mining, the rock is processed chemically, typically by treatment with acids, to convert the phosphorus into forms that plants can readily absorb. This processing yields concentrated phosphate fertilizers used in commercial agriculture.

26.     Common phosphate fertilizer products include Diammonium phosphate, Monoammonium phosphate, and Triple superphosphate. These fertilizers are generally manufactured as dry granules that can be transported in bulk and applied directly to fields or blended with other nutrients in compound fertilizers.

*Potash Fertilizers:*

27.     Potash fertilizers supply potassium, another primary plant nutrient required for healthy crop growth. Potassium helps regulate water movement within plant tissues, activates enzymes involved in metabolism, and supports plant tolerance to environmental stresses such as drought or disease. Adequate potassium availability can contribute to improved crop quality and resilience.

28.     Potash fertilizers are produced from naturally occurring potash ores formed from ancient, evaporated seas. These mineral deposits are mined or extracted from brines and then processed to separate potassium-bearing compounds suitable for agricultural use. The resulting products contain potassium in forms that plants can absorb as potassium ions.

29.     The most widely used potash fertilizer is Potassium chloride, while Potassium sulfate is also used, particularly for crops that are sensitive to chloride. Potash fertilizers are typically sold as crystalline or granular solids that can be applied directly to fields or blended with other nutrients in compound fertilizers.

**B.     The Market for NPK Fertilizers**

30.     American farms cultivate over 220 million acres of cropland, driving an unrelenting demand for NPK Fertilizers. In 2024, the U.S. NPK Fertilizer market was estimated to be valued at almost $30 billion.

31.     NPK Fertilizers are favored over other fertilizers because they supply the three macronutrients that crops need in the largest amounts, are highly concentrated, predictable, and fast-acting, allowing farmers to efficiently meet crop nutrient requirements. Unlike organic fertilizers, NPK Fertilizers provide precise nutrient content, are easy to store and transport, release

nutrients more quickly into the soil, and are adaptable to most major crops and soil types, making them the primary choice for high-yield, modern agriculture.

32. The Fertilizer industry in the United States has long been characterized by significant consolidation. The NPK Fertilizer industry experienced a drastic consolidation following various market conditions dating back to the 1980s.[1] As a result, today each of the major nutrient industries is dominated by a single corporation: Mosaic reigns over the American phosphate market, CF Industries commands the nitrogen sector, and Nutrien has taken charge of the North American potash market as the leading member along with Mosaic.[2] The number of firms in the market has reduced from 46 to 13 since the 1980s, with Defendants now controlling a substantial portion of the market.[3]

### C. Government Investigation into Price-Fixing in the Fertilizer Industry

33. On October 28, 2025, President of the Iowa Corn Growers Association ("ICGA"), Mark Mueller, addressed a U.S. Senate Committee Hearing on Competition Issues in the Seed & Fertilizer Industries, telling them that, "the massive increase in the cost of fertilizer is crushing corn growers in Iowa, and they aren't alone. Growers across the country are facing an impossible decision: buy fertilizer or stay solvent."[4] Mueller attributed the high fertilizer prices to two decades

---

[1] *See* Farm Action Fact Sheet: The Fertilizer Sector, *available at* https://farmaction.us/wp-content/uploads/2024/09/Fertilizer_Farm-Action.pdf ("The fertilizer industry has a historical precedence of extreme consolidation…").

[2] *Id.*

[3] Nathan Beacom, Record Prices Give rise to Consolidation Concerns in the Fertilizer Industry (Sept. 23, 2022), *available at* https://ambrook.com/offrange/supply-chain/record-prices-consolidation-concerns-fertilizer-industry-ukraine-nitrogen.

[4] Testimony of Mark Mueller President of the Iowa Corn Growers Association, U.S. Senate Committee Judiciary Hearing on Competition Issues in the Seed & Fertilizer Industries (Oct. 28, 2025), *available at* https://www.grassley.senate.gov/imo/media/doc/mark_mueller_testimony_senate_judiciary_committee_submitted_version.pdf (last visited Mar. 6, 2026).

of unchecked consolidation in the U.S. Fertilizer industry, which left only a few major companies controlling each market segment.[5]

34.     According to Mueller, the effects of this market concentration had led to fertilizer costs that far outpaced the price farmers received for their corn.[6] For example, the amount of corn sales required to purchase one unit of monoammonium phosphate (a fertilizer that combines phosphorous and nitrogen) had increased from an average of 136 bushels over the last five years to 230 bushels today, increasing the economic pressure on farmers, as fertilizer prices escalate while crop revenues remain comparatively stagnant.[7]

35.     In December 2025, President Donald Trump issued an Executive Order directing the U.S. Attorney General and the Chairman of the Federal Trade Commission to each establish a Food Supply Chain Security Task Force within their respective agencies to aggressively investigate price-fixing and anti-competitive practices across the food sector.[8]

36.     On January 21, 2026, United States Department of Agriculture Deputy Secretary, Stephen Vaden, held a videotaped conversation with the National Agricultural Law Center, in which he attributed high fertilizer prices to anticipative conduct, telling the audience that:

> Mosaic and Nutrien[] have a joint venture in Canada where they openly, their word[,] work together, my word, collude to control prices up there. That would be such a clear violation of the antitrust laws of the United States. They don't bring that joint venture officially down here in the United States, but what they've been able

---

[5] *Id*.

[6] *Id*.

[7] *Id*.

[8] The White House, Fact Sheet: President Donald J. Trump Addresses Security Risks from Price Fixing and Anti-Competitive Behavior in the Food Supply Chain (Dec. 6, 2025), *available at* https://www.whitehouse.gov/fact-sheets/2025/12/fact-sheet-president-donald-j-trump-addresses-security-risks-from-price-fixing-and-anti-competitive-behavior-in-the-food-supply-chain/ (last visited Mar. 6, 2026).

to manage to do through other means is achieving the same result, constraining supply and driving up the price that farmers pay.[9]

37.     In February 2026, both the ICGA and the Texas Corn Producers Association sent separate letters to U.S. Attorney General Pam Bondi seeking information about what the U.S. Department of Justice ("DOJ") is doing to pursue possible antitrust actions against the fertilizer industry.[10] As reported by Progressive Farmer, the letters reflect farmers' growing frustrations over lower crop returns while fertilizer prices continue to remain high.[11]

38.     On March 4, 2026, Bloomberg reported that the DOJ Antitrust Division had opened a formal antitrust investigation into the pricing practices of major Fertilizer producers to determine whether they colluded or coordinated to raise nitrogen, phosphate and potash fertilizer prices for U.S. farmers.[12] Bloomberg further reported that the investigation is looking at CF Industries, Koch Inc., Mosaic, Nutrien, and Yara International. Those companies are the dominant suppliers of fertilizer products in the United States.[13] Sources told reporters the government inquiry is examining whether coordinated pricing or supply decisions crossed the line into civil or criminal antitrust violations.[14]

---

[9] A Conversation with USDA Deputy Secretary Stephen Vaden (Jan. 21, 2026), recording *available at* https://nationalaglawcenter.org/webinars/vaden/ (last visited Mar. 6, 2026).

[10] Progressive Farmer, Report: DOJ Looking at Fertilizer Cos. (Mar. 5, 2026), *available at* https://www.dtnpf.com/agriculture/web/ag/crops/article/2026/03/05/iowa-corn-growers-urge-doj-press?utm_source=chatgpt.com (last visited Mar. 6, 2025).

[11] *Id.*

[12] Bloomberg, DOJ Probes US Fertilizer Market for Possible Price Fixing (Mar. 4, 2026), *available at* https://www.bloomberg.com/news/articles/2026-03-04/doj-probes-us-fertilizer-market-for-possible-price-fixing?utm_source=chatgpt.com (last visited Mar. 6, 2026).

[13] *Id.*

[14] FarmProgress, DOJ probes U.S. fertilizer market for possible price fixing (Mar. 4, 2026), *available at* https://www.farmprogress.com/farm-business/doj-probes-u-s-fertilizer-market-for-possible-price-fixing (last visited Mar. 6, 2026).

**D.     Prices for NPK Fertilizers Rose Precipitously During the Class Period and Remained Elevated Despite Lower Input Prices and Lower Demand**

39.     Prior to the start of the conspiracy, NPK Fertilizer price increases were typically transitory, and market forces corrected pricing (consistent with a competitive market).

40.     NPK Fertilizer prices became significantly elevated during the Class Period as a result of Defendants' conduct. This was contrary to pricing patterns prior to the Class Period.

41.     These increases cannot be explained by input costs.

**E.     The Structure and Characteristics of the Market for NPK Fertilizers Support the Existence of a Conspiracy**

42.     Economic literature makes clear that structural market factors can be important in assessing whether conspiratorial conduct in violation of the antitrust laws has occurred. While collusion can occur in almost any industry, it is more likely to occur in some industries than in others. An indicator of collusion may be more meaningful when industry conditions are already favorable to collusion.

43.     ***Concentration of supply side:*** The Defendants are among the largest producers of NPK Fertilizers sold in the United States and together control over 80% of the North American nitrogen fertilizer market and over 90% of the North American phosphate and potash markets. Because the manufacture of NPK Fertilizers is highly concentrated, with the Defendants controlling the vast majority of production, the NPK Fertilizer market is highly susceptible to collusion.[15]

---

[15] *See* https://www.justice.gov/atr/preventing-and-detecting-bid-rigging-price-fixing-and-market-allocation-post-disaster-rebuilding ("Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories.") (last visited Mar. 6, 2026).

44.     *Standardization:* NPK Fertilizers are standardized because their nutrients are basic chemical components traded as commodities and used interchangeably, regardless of the specific source. This standardization also makes it easier for competing firms to coordinate on a common price structure.

45.     *Opportunities to collude at trade association meetings:* Collusion also may be facilitated by trade associations. Here, Defendants have had multiple opportunities to collude through trade associations to which they belonged and served as board members. For example, all six Defendants are active members of the International Fertilizer Association ("IFA"),[16] a global fertilizer association, headquartered in Paris, France.[17] Bruce Bohn (CF Industries), Bruce Bodine (The Mosaic Company), Kenneth Seitz (Nutrien), and Svein Tore Holsether (Yara International ASA), are also members of IFA's Board.[18] IFA sponsors a number of recurring in-person trade events including the IFA Annual Conference and the Cultivating Tomorrow Conference.[19]

46.     Similarly, CF Industries, Inc, Koch Fertilizer, LLC., The Mosaic Company, Nutrien, and Yara North America, Inc., are all members and Board members, of The Fertilizer Institute ("TFI"), a national fertilizer industry organization headquartered in Arlington, Virginia.[20] In addition to offering exclusive members-only "market volatility information and resources,"[21]

---

[16] https://www.fertilizer.org/about-ifa/our-members/ (last visited Mar. 6, 2026).

[17] https://www.fertilizer.org/about-ifa/contact-us/ (last visited Mar. 6, 2026).

[18] https://www.fertilizer.org/about-ifa/structure-governance/our-board/ (last visited Mar. 6, 2026).

[19] https://www.fertilizer.org/news-events/events/ (last visited Mar. 6, 2026).

[20] https://www.tfi.org/about-us/leadership/ (last visited Mar. 6, 2026).

[21] Market Intelligence Insights - The Fertilizer Institute (last visited Mar. 6, 2026).

TFI also sponsors a number of trade events, including an Annual Business Conference, Agronomy Conference and Expo, World Fertilizer Conference, and Market & Logistics Conference.[22]

47.     All six Defendants are members of Fertilizer Canada ("FC"), a Canadian fertilizer industry organization headquartered in Ottawa, Ontario.[23] CF Industries, Inc., Koch Fertilizer Canada, ULC, The Mosaic Company, Nutrien, and Yara North America, Inc. are members of the Board of FC.[24] FC is an organization representing producers, manufacturers, wholesale and retail distributors of nitrogen, phosphate, potash and sulfur fertilizers.[25]

48.     Nutrien Ltd., The Mosaic Company, and Koch Sulfur Products Company L.L.C., are all members[26] and Board members[27] of The Sulfur Institute ("TSI"), a global association for sulfur and sulfuric acid professionals, based in Washington, D.C.[28] TSI sponsors a number of in-person trade events each year, such as the Sulphur World Symposium and its annual Executive Committee Meeting.[29]

49.     Both David Bilby (CF Industries) and Shawn McGreevy (Koch Fertilizer LLC), are Board members of the Fertilizer Industry Round Table ("FIRT"), a fertilizer trade group.[30] Gary

---

[22] https://www.tfi.org/events/event-calendar/ (last visited Mar. 6, 2026).

[23] https://fertilizercanada.ca/about/ (last visited Mar. 6, 2026).

[24] https://fertilizercanada.ca/about/ (last visited Mar. 6, 2026).

[25] https://fertilizercanada.ca/about/ (last visited Mar. 6, 2026).

[26] https://www.sulphurinstitute.org/about-tsi/member-companies/ (last visited Mar. 6, 2026).

[27] https://www.sulphurinstitute.org/about-tsi/board-of-directors/ (last visited Mar. 6, 2026).

[28] https://www.sulphurinstitute.org/about-tsi/mission-and-programs/ (last visited Mar. 6, 2026).

[29] https://www.sulphurinstitute.org/events/tsi-meetings-and-events/ (last visited Mar. 6, 2026).

[30] http://www.firt.org/about/current-board (last visited Mar. 6, 2026).

Vogen (Yara North America, Inc.), previously served as a Board member of FIRT.[31] FIRT hosts an annual meeting, in partnership with TFI.[32]

50.     Both Koch Agronomic Services, LLC and The Mosaic Company are members of the Agricultural Retail Association ("ARA"), an industry trade group based in Arlington, Virginia.[33] Additionally, Nathan Packer (Nutrien Ag Solutions) and Bob Ness (The Mosaic Company), are members of the Board of ARA.[34] ARA hosts a number of recurring in-person events, including the Annual ARA Conference and Expo,[35] in addition to semi-annual in-person meetings of ARA committees.[36]

51.     ***High barriers to entry:*** There are also high barriers to becoming a manufacturer of NPK Fertilizers. A large capital investment is required to enter the industry, as companies wishing to enter must purchase machines and operating space to manufacture NPK Fertilizers. The importance of research and development in the industry also may deter new entrants.

52.     Potential entrants to the industry also must make a significant financial investment to acquire, maintain and update production facilities and equipment. Larger players have an advantage because they are able to build or acquire multiple manufacturing facilities, discouraging others from entering.

53.     Thus, the start-up capital necessary to compete with today's NPK Fertilizer manufacturers would be substantial. NPK Fertilizer manufacturers have significant economies of

---

[31] http://www.firt.org/about/past-member (last visited Mar. 6, 2026).

[32] http://www.firt.org/about (last visited Mar. 6, 2026).

[33] https://www.aradc.org/members (last visited Mar. 6, 2026).

[34] https://www.aradc.org/board (last visited Mar. 6, 2026).

[35] https://www.aradc.org/2026-conference-expo (last visited Mar. 6, 2026).

[36] https://www.aradc.org/get-involved (last visited Mar. 6, 2026).

scale, utilizing large and expensive production facilities. Barriers to entry in NPK Fertilizer manufacturing both prevent new competitors from entering the market and make the market susceptible to collusion.

54.     *Inelastic demand:* Demand for NPK Fertilizers is inelastic. Industries with inelastic demand, such as the NPK Fertilizers manufacturing industry, are more susceptible to cartel formation and behavior than industries with elastic demand.

55.     A lack of substitute goods may be a characteristic of inelastic demand. NPK Fertilizers cannot be interchanged freely with other goods—although there are other fertilizers, NPK Fertilizers are unique because they provide precise, balanced nutrients, rapid soil availability, and broad crop adaptability, making them distinct from other fertilizers.

56.     Customers similarly do not view NPK Fertilizers as interchangeable with other fertilizers.

57.     *Unconcentrated demand side:* The unconcentrated nature of the demand side of the NPK Fertilizers market and lack of buyer power sufficient to stimulate competition also makes this market susceptible to collusion. Such a large number of buyers, each of whom forms a small share of the total marketplace, means that there is less incentive for Defendants to cheat on collusive pricing arrangements, since each potential sale is small, while the risk of disrupting the collusive pricing agreement carries large penalties.

58.     *History of antitrust violations:* Finally, The NPK Fertilizers industry has a history of antitrust scrutiny. In 2008, U.S. purchasers filed antitrust lawsuits alleging that major producers—including companies such as Mosaic, PotashCorp, and Agrium—coordinated

production and sales to keep potash prices artificially high.[37] Plaintiffs alleged producers shared market information, allocated volumes, and restricted output as part of a "tight-knit global cartel."[38] Several companies later settled private antitrust claims, with settlements around $43.75 million each from firms such as Mosaic and PotashCorp (without admitting wrongdoing).[39]

## V.  ANTITRUST IMPACT AND DAMAGES TO THE PLAINTIFF AND THE CLASS

59.  Because of the Defendants' anticompetitive conduct: (1) competition in the NPK Fertilizers market has been reduced or eliminated, (2) prices for NPK Fertilizers have been maintained at supracompetitive levels, and (3) United States purchasers of NPK Fertilizers have been deprived of the benefit of price competition.

60.  As described herein, during the Class Period, Plaintiff directly purchased NPK Fertilizers from the Defendants.

61.  As a result of the Defendants' anticompetitive conduct, Plaintiff and Class members paid more for NPK Fertilizers than they otherwise would have and thus suffered antitrust injury and damages. The overcharges paid by Plaintiff and members of the Class for NPK Fertilizers constitutes antitrust injury and harm to competition under the federal antitrust laws.

---

[37] *See* Potash Producers Must Face Buyers' U.S. Antitrust Lawsuit (July 27, 2012), *available at* https://www.fertilizerworks.com/news/potash-producers-must-face-buyers%E2%80%99-us-antitrust-lawsuit?utm_source=chatgpt.com (last visited Mar. 6, 2026) (discussing *Minn-Chem Inc. v. Agrium Inc.*, No. 10-1712 (7th Cir. 2008).

[38] *See* Potash Price-Fixing Conspiracy Alleged (Sept. 12, 2008), *available at* https://www.courthousenews.com/potash-price-fixing-conspiracy-alleged/?utm_source=chatgpt.com (last visited Mar. 6, 2026).

[39] The Mosaic Company Announces Settlement of Potash Antitrust Litigation (Jan. 30, 2013), *available at* https://www.prnewswire.com/news-releases/the-mosaic-company-announces-settlement-of-potash-antitrust-litigation-189020521.html?utm_source=chatgpt.com (last visited Mar. 6, 2026).

## VI.   CLASS ACTION ALLEGATIONS

62.   Plaintiff brings this action on behalf of itself and as a class action under Rules 23(a),

(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the

"Class"):

> All persons and entities in the United States and its territories who purchased NPK Fertilizers directly from any of the Defendants or their subsidiaries or affiliates during the period beginning no later than January 1, 2021 until the date on which a class is certified in this case. Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, officers, directors, employees, assigns, successors, agents, and the Court and its staff.

63.   ***Numerosity.*** While Plaintiff does not know the exact number of members of the

Class, Plaintiff believes the class size is so numerous that joinder is impracticable given

Defendants' substantial nationwide presence.

64.   ***Commonality.*** Common questions of law and fact exist as to all members of the

Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct,

which was generally applicable to all the members of the Class, thereby making relief with respect

to the Class as a whole appropriate. Such questions of law and fact common to the Class include,

but are not limited to:

> (a)   Whether Defendants engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of NPK Fertilizers in the United States and its territories;
>
> (b)   The identity of the participants in the alleged conspiracy;
>
> (c)   The duration of the alleged conspiracy and the acts carried out by Defendants in furtherance of the conspiracy;
>
> (d)   Whether the alleged conspiracy violated Sections 1 and 3 of the Sherman Act;
>
> (e)   Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Class;

17

(f)     The effect of the alleged conspiracy on the price of NPK Fertilizers during the Class Period;

(g)     Whether the Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the members of the Class;

(h)     The appropriate injunctive and related equitable relief for Plaintiff and the Class; and

(i)     The appropriate class-wide measure of damages.

65.     **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiff and undersigned counsel will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for fertilizer from Defendants.

66.     **Adequacy.** Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

67.     **Predominance.** The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

68.     **Superiority.** Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh

any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VII. INTERSTATE TRADE AND COMMERCE

69.     Billions of dollars of transactions in NPK Fertilizers are entered into each year in interstate commerce in the United States and its territories and the payments for those transactions flowed in interstate commerce.

70.     Defendants' conspiracy had a direct, substantial, and foreseeable impact on interstate commerce in the United States and its territories.

71.     Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for NPK Fertilizers in the United States.

72.     Defendants' unlawful conduct has a direct and adverse impact on competition in the United States and its territories. Absent Defendants' conspiracy to fix the prices of NPK Fertilizers sold in the United States, the prices of NPK Fertilizers would have been determined by a competitive, efficient market.

## VIII. ANTITRUST INJURY

73.     Defendants' antitrust conspiracy had the following effects, among others:

(a)     Price competition has been restrained or eliminated with respect to the pricing of NPK Fertilizers;

(b)     The prices of NPK Fertilizers have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)     Purchasers of NPK Fertilizers have been deprived of the benefits of free and open competition; and

(d)     Purchasers of NPK Fertilizers paid artificially inflated prices.

74.     The purpose of the conspiratorial and unlawful conduct of Defendants and their was to fix, raise, stabilize, and/or maintain the price of NPK Fertilizers.

75.     The precise amount of the overcharge impacting the prices of NPK Fertilizers paid by Plaintiff and the Class can be measured and quantified using well-accepted models.

76.     By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Class have sustained injury to their businesses or property, having paid higher prices for NPK Fertilizers than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## IX.     CLAIM

### Count I: Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)
### (Conspiracy in Restraint of Trade)

77.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

78.     Beginning as early as January 1, 2021, the exact date being unknown, until the date on which any Class is certified, Defendants entered into and engaged in a contract, combination, or conspiracy with regard to fertilizer in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

79.     The contract, combination, or conspiracy consisted of an agreement among the Defendants to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for NPK Fertilizers in the United States and its territories.

80.     In formulating and effectuating this conspiracy, Defendants did those things that they combined and conspired to do, including the following:

(a)     Exchanging competitively sensitive information among themselves, with the aim to fix, raise, stabilize, or maintain prices of NPK Fertilizers sold in the United States and its territories;

(b)     Participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, raise, stabilize, or maintain prices of NPK Fertilizers, including surcharges on NPK Fertilizers sold in the United States and its territories; and

(c)     Participating in meetings and conversations among themselves to implement, adhere to, and police the agreements they reached.

81.     Defendants engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, stabilize, or maintain prices of fertilizer.

82.     Defendants' conspiracy had the following effects, among others:

(a)     Price competition in the market for NPK Fertilizers has been restrained, suppressed, and/or eliminated;

(b)     Prices for NPK Fertilizers provided by Defendants have been fixed, raised, stabilized, or maintained at artificially high, non-competitive levels throughout the United States and its territories; and

(c)     Plaintiff and members of the Class who purchased NPK Fertilizers from Defendants have been deprived of the benefits of free and open competition.

83.     Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for NPK Fertilizers purchased from Defendants and than they would have paid and will pay in the absence of the conspiracy.

84.     The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

85.     Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants to prevent and restrain the violations alleged herein.

## X.     PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the Class respectfully request the following relief:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as representative of the Class and the undersigned law firms as Class Counsel, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.     The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and that acts done in furtherance thereof by Defendants be adjudged to have been *per se* violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

C.     The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, and from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.     That Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E.      That each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

F.      That the Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## XI.      JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.


Dated: March 7, 2026                          Respectfully submitted,

                                               /s/  Gary M. Klinger
                                              Gary M. Klinger
                                              **MILBERG, PLLC**
                                              227 W. Monroe Street, Suite 2100
                                              Chicago, IL 60606
                                              Telephone.: 866.252.0878
                                              Email: gklinger@milberg.com

                                              Linda P. Nussbaum*
                                              **NUSSBAUM LAW GROUP, P.C.**
                                              1225 Franklin Avenue, Suite 325
                                              Garden City, NY 11530
                                              Telephone: (917) 438-9189
                                              Email: lnussbaum@nussbaumpc.com

Marco Cercone*
**RUPP PFALZGRAF LLC**
1600 Liberty Building
424 Main Street
Buffalo, NY 14202
Telephone: (716) 854-3400 Ext 214
Email:  cercone@RuppPfalzgraf.com

*Pro Hac Vice Application Forthcoming*


*Attorneys for Plaintiffs*